# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 27, 2016

Plaintiff-Appellee,

v

No. 329361
Kent Circuit Court

ISAAC MICHAEL-PAUL FEZZEY,

LC No. 14-010940-FC

Defendant-Appellant.

Before: BORRELLO, P.J., and SAWYER and MARKEY, JJ.

PER CURIAM.

Defendant appeals by right his convictions for felony murder, MCL 750.316(1)(b); armed robbery, MCL 750.529; first-degree home invasion, MCL 750.110a(2); unlawful imprisonment, MCL 750.349b; assault with intent to do great bodily harm less than murder, MCL 750.84; and felony-firearm, MCL 750.227b. The trial court sentenced defendant to life imprisonment for felony murder; 15 to 60 years' imprisonment for armed robbery; 7 to 20 years' imprisonment for first-degree home invasion; 5 to 15 years' imprisonment for unlawful imprisonment; 5 to 10 years' imprisonment for AWIGBH; and 2 years' imprisonment for felony-firearm. The trial court ordered defendant's sentences to run concurrently, except that all defendant's other sentences were to run consecutive to his felony-firearm sentence. We affirm.

On the night of September 7, 2014, defendant and three other men participated in a commando style raid of the victim's residence in Kent County, Michigan. The men had information that the victim was keeping $80,000 in cash, which the victim acquired from selling drugs, stashed in his house. The four men drove to the victim's house in defendant's car. The defendant and two other men were dropped off, and approached the victim's house from the back. Video footage from security cameras outside the victim's house showed that they were all armed with guns, dressed in dark clothing, and their faces were covered. The three men then broke through the victim's backdoor, and one of the men shot and killed the victim's dog.

Defendant secured the living room, while the two other men went to the victim's bedroom. Josh Hansen, the victim's cousin, was the victim's roommate. He woke up to noises and went out to the living room to investigate. When he saw defendant standing there with a gun pointed at Hansen's face, Hansen assumed that defendant was with the police and was there to raid Hansen's house. To cooperate, Hansen got down on his knees. After Hansen got down, defendant beat him with the butt of his gun until Hansen was unconscious.

Meanwhile, when the other two men approached the victim's room, the victim jumped out the window next to his bed. One of the men fired at the victim as he ran, then pursued the victim out the back. The victim's girlfriend was staying at the victim's house that night, and the other man tied her up and brought her out to the kitchen. After bringing Hansen into the kitchen, defendant went into the victim's room and began searching for the $80,000. Outside, the man pursuing the victim fired two shots at the victim from the victim's back deck. The man then caught up to the victim and stabbed him several times with a knife. The victim managed to escape and ran into the street, where the fourth man involved in the raid drove up in defendant's car. The victim got into defendant's car, and the driver proceeded to kick the victim out into the street, where the victim eventually died. According to the medical examiner that performed the autopsy of the victim, the victim had six bullet wounds, one of which would have been fatal; two stab wounds from a knife, both of which would have been fatal; and potentially fatal head injuries consistent with falling from a vehicle and hitting the person's head on concrete.

The driver pulled defendant's car behind the victim's house, and all three men got in and drove away. The four men drove to Zachary Bennett's house, who was their friend. The men told Bennett about the robbery, that they had a scuffle with the victim, and that they did not get any money. The four men returned the next day after they found out that the victim had died. They proceeded to relay in detail to Bennett their accounts of the night before. Eventually, all four men were arrested. The police interviewed defendant, during which defendant confessed to his involvement in the robbery of the victim's home. While defendant was in prison, he wrote numerous letters, four of which were presented at trial. In those letters, defendant confessed to his involvement in the robbery.

A search warrant was executed for defendant's apartment and revealed three guns that matched the type of guns that the men were carrying in the victim's security footage. Ballistics matched two of the guns from defendant's apartment to used and unused casings of ammunition found at the victim's residence. A search of defendant's car revealed several blood stains, including one soaked all the way through the seat to the floor. A DNA analysis matched the blood stains to the victim. Another search warrant executed at defendant's biological mother's house revealed a burn pile that contained burned boots, burned pieces of clothing, and pieces of nylon.

On appeal, defendant first argues that trial counsel was ineffective for failing to object to the admission of defendant's confession because defendant invoked his Fifth Amendment right to counsel before he confessed. We disagree. "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

A defendant must meet a two part test to warrant a new trial based on ineffective assistance of counsel: "First, the defendant must show that counsel's performance fell below an objective standard of reasonableness," and "[s]econd, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable." *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011), citing *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). When claiming ineffective

assistance of counsel, the "defendant bears a heavy burden in establishing that counsel's performance was deficient and that [the defendant] was prejudiced by the deficiency." *People v Lopez*, 305 Mich App 686, 693-694; 854 NW2d 205 (citation and quotation marks omitted). When applying the *Strickland* test, this Court " 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' " taking into account that under the circumstances, " 'the challenged action "might be considered sound trial strategy." ' " *LeBlanc*, 465 at 578, quoting *Strickland*, 466 US at 687.

"[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and [] the police must explain this right to him before questioning begins." *Davis v United States*, 512 US 452, 457; 114 S Ct 2350; 129 L Ed 2d 362 (1994). When a defendant invokes his right to counsel, the police must terminate their interrogation immediately and may not resume questioning until such counsel arrives." *People v Tierney*, 266 Mich App 687, 710-711; 703 NW2d 204 (2005). "However, the defendant's invocation of his right to counsel must be unequivocal." *Id*. at 711. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 US at 459.

In this case, defendant made several statements regarding the presence of an attorney that defendant contends were unequivocal invocations of defendant's right to counsel. Specifically, before signing a statement waiving his right to counsel, defendant made reference to an attorney on four occasions when he stated as follows:

Defendant: I would prefer a lawyer though, I'm not gonna lie. I'll say that right now.

* * *

Defendant: I will be given a lawyer as soon as possible? Cause I don't know a lot of the rules. I'd rather have someone that has experience interpreting them for me.

Detective: Fair enough. If you don't want to talk to us without a lawyer present that is your right.

Defendant: I will listen to your questions, but I'm probably not going to say anything until I've talked to someone at least.

* * *

Defendant: I mean, I have no issue talking, but again, I would like to see a lawyer and, I mean, if I have to wait till morning then so be it. But I'd be willing to talk then.

* * *

Defendant: Well, we can talk for a bit. I'm still gonna get a lawyer, right?

-3-

The Michigan Supreme Court held that a defendant's statement that "he would 'just as soon wait' until he had an attorney before talking to police, followed immediately by his statement that he was willing to discuss the 'circumstances,' was not an unequivocal assertion of the right to counsel." *People v McKinney*, 488 Mich 1054, 1054; 794 NW2d 614 (2011). Likewise, this Court held that the statements "[m]aybe I should talk to an attorney," and "I might want to talk to an attorney" were not "sufficient to invoke . . . [the] right to counsel." *Tierney*, 266 Mich App at 711. Further, this Court found that the statement "[c]an I talk to [a lawyer] right now?" was not an unequivocal invocation of the right to counsel because defendant was "merely inquir[ing] into the way the process worked, not [making] an actual demand for an attorney." *People v Adams*, 245 Mich App 226, 238; 627 NW2d 623 (2001).

In this case, none of defendant's statements constituted an unequivocal or unambiguous invocation of defendant's right to counsel. First, defendant's statement that he "would prefer a lawyer" merely stated defendant's preference and was not a demand. Defendant's statement indicated that he would rather proceed with an attorney present than without one, but fell short of requesting anything, much less demanding the presence of an attorney. Accordingly, this statement was not an unequivocal invocation of defendant's right to counsel.

Likewise, defendant questions whether he would "be given a lawyer as soon as possible" and whether he was "still gonna get a lawyer" were not an invocation of his right to counsel. It appears that defendant in these instances, like the defendant from *Adams*, 245 Mich App at 238, was inquiring into the way that the process worked, which is not a demand for an attorney. Defendant's statement that he didn't "know a lot of the rules" bolsters this conclusion. Further, both of defendant's questions were in regard to whether defendant would be afforded the assistance of an attorney in the future, which this Court has held does not reflect a present desire for counsel. *McKinney*, 488 Mich at 1054; see also *People v Granderson*, 212 Mich App 673, 676-677; 538 NW2d 471 (1995). Moreover, shortly after defendant questioned whether he would "be given a lawyer as soon as possible," he followed up by saying that he would "listen to [the detective's] questions, but [he was] probably not going to say anything." This reasonably indicated to the detectives that defendant desired the interview to continue without the presence of an attorney, showing that defendant's question was not a demand for counsel. Accordingly, defendant's questions were not unequivocal requests for counsel.

Lastly, defendant's statement of "I mean, I have no issue talking, but again, I would like to see a lawyer and, I mean, if I have to wait till morning then so be it," taken as a whole, does not rise to the level of an unambiguous invocation of defendant's right to counsel. An ambiguous statement is one that is "capable of being understood in two or more possible senses or ways." *Merriam-Webster's Collegiate Dictionary* (11th ed). Defendant's statement can reasonably be interpreted in at least two ways. First, the detectives could have reasonably interpreted defendant's statement to mean that he was willing to continue the interview, but that he eventually desired to speak to an attorney, even if he had to wait until morning. Alternatively, the defendant's statement could have been interpreted as meaning that defendant only wished to talk when he had a lawyer present, even if that meant stopping the interview until the morning. Because defendant's statement was ambiguous, it was inherently equivocal, and the detectives were not required to cease questioning defendant when defendant's reference to counsel was equivocal. *Tierney*, 266 Mich App 687, 710-711. Accordingly, because none of defendant's statements during his police interview constituted an invocation of defendant's right to counsel,

an objection to the admission of the interview would have been futile, and defense counsel was not ineffective for failing to make such an objection.

Even if defendant invoked his right to counsel, defense counsel was not objectively unreasonable in its decision to allow the admission of defendant's police interview into evidence. "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). As such, defense "counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases," and there is a "strong presumption that trial counsel's performance was strategic." *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008). In considering whether defense counsel's decision was strategic, this Court must "affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did." *People v Gioglio (On Remand)*, 296 Mich App 12, 22; 815 NW2d 589 (2012), vacated in part on other grounds 493 Mich 864 (2012) (citation and quotation marks omitted).

In this case, defense counsel could have reasonably decided to allow the police interview in order to later admit evidence of defendant's Asperger's Syndrome, thereby attempting to appeal to the sympathy of the jury. This evidence would have been otherwise inadmissible. See *People v Carpenter*, 464 Mich 223, 232; 627 NW2d 276 (2001). However, once the video of defendant's police interview was played, defense counsel could present evidence of defendant's Asperger's Syndrome to explain statements made during the interview. See *People v Yost*, 278 Mich App 341, 357; 749 NW2d 753 (2008). The admission of defendant's Asperger's Syndrome was an attempt by defense counsel to generate sympathy for defendant. *Gioglio*, 296 Mich App at 22. Attempting to generate sympathy for a defendant is a legitimate trial strategy. Therefore, defense counsel did not render ineffective assistance by allowing the video to be admitted.

Even if defense counsel was ineffective in allowing the video to be admitted, defendant was not prejudiced by defense counsel's decision. Without the interview, the prosecution presented ample evidence that a jury could use to find defendant guilty of the charged crimes, including Bennett's extensive testimony regarding the events surrounding the robbery; the video footage from the outside of the victim's home that showed defendant's car passing the residence and three individuals approaching the home with guns; the victim's blood in defendant's car; the guns found in defendant's home and the ballistic evidence matching those guns to rounds of ammunition found at the victim's home; and defendant's letters while he was in prison, in which defendant confessed his involvement in the robbery. Therefore, even had the police interview been excluded, the same "result would have been reasonably probable." *Armstrong*, 490 Mich at 290.

Defendant next argues that the prosecution engaged in several instances of misconduct that deprived him of a fair trial. We disagree. Because defendant did not object to the alleged misconduct, defendant failed to preserve this issue. *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003). Because defendant failed to preserve this issue, "review is limited to ascertaining whether plain error affected defendant's substantial rights." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). "Reversal is warranted only when plain error

resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Fyda*, 288 Mich App 446, 461; 793 NW2d 712 (2010). "Further, [this Court] cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Bennett*, 290 Mich App at 475-476 (alteration in original; citation and quotation marks omitted). Jurors are presumed to follow the trial court's curative instructions. *Unger*, 278 Mich App at 235.

In this case, defendant first argues that the prosecution engaged in misconduct when it discussed a legally inaccurate hypothetical regarding the character "Granny" with prospective jurors during voir dire and that the prosecution used this hypothetical to improperly instruct jurors as to the elements of felony murder. The hypothetical stated as follows:

> [*Prosecutor*]: What if he says – she says to cousin, says "I'm going to rob this place," and cousin talks her out of it, he thinks "we're good," and they go to the store, he just sits in the car, and in the window he sees Granny pull the gun, and he sees Granny shoot the clerk and kill him. She runs to the car and she says, let's go, let's go, and he drives her off, and they split the proceeds of what she got. Is he now in trouble?
>
> *Jurors*: Yes.
>
> [*Prosecutor*]: The law says that he's as guilty as Granny because he knowingly assisted. Okay?

In *People v Bulls*, 262 Mich App 618, 624; 687 NW2d 159 (2004) (citation and quotation marks omitted), this Court held that to find a defendant guilty of felony murder as a principal under an aiding and abetting theory, the prosecution must prove that defendant

> (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony.

Defendant correctly asserts that the prosecution's hypothetical misapplied the law for aiding and abetting a felony murder because the cousin lacked the requisite intent. Therefore, the prosecution's hypothetical was error.

However, defendant failed to establish that this error "affected . . . defendant's substantial rights," Brown, 279 Mich App at 134, or "resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings," *Fyda*, 288 Mich App at 461. The evidence against defendant to support the defendant's conviction for felony murder was overwhelming. Specifically, Bennett testified that defendant supplied the guns used in commission of the robbery, video footage showed defendant and his accomplices approaching the victim's home armed with those guns, ballistic evidence found at the victim's home showed that the guns used in the robbery were loaded with live

-6-

ammunition, and defendant admitted his involvement in the robbery in his letters from prison. Based on this evidence, a jury could find the three elements necessary for a conviction of felony murder under an aiding and abetting theory. Therefore, the error did not affect defendant's substantial rights or result in the conviction of an actually innocent defendant. *Id.*

Further, the trial court attempted to correct the prosecution's potentially inaccurate hypothetical. Specifically, the trial court stated:

> I don't want to be too arcane about it, but there actually [are] different levels of accessorial liability. The aiding and abetting which the prosecutor is talking about requires that the person have assisted in the commission of the crime intending that the crime be committed at the front end and during the course of the criminal act. If someone merely helps a perpetrator escape after a crime . . . has been committed, it's a much lesser crime, it's accessory after the fact. And I don't think we're dealing with that here, although I guess we'll let the facts speak for themselves.

The trial court was correct in its assessment that the cousin in the prosecution's hypothetical was not guilty as an aider and abettor, but rather as an accessory after the fact. This statement presumably clarified the prosecutor's hypothetical, eliminating any potentially prejudicial effect that the statement may have had on the proceeding. *Unger*, 278 Mich App at 235.

Moreover, at the beginning of the trial, the trial court stated that the jury "must take the law as I give it to you," and at the close of the proceedings, the trial court again instructed the jury to only apply the trial court's interpretation of the law when it stated as follows: "If a lawyer has said something different about the law, you are to follow what I say in that connection." These statements by the trial court were clear instructions for the jury to only apply the law of the trial court, and to ignore any statements regarding the law made by counsel. This cured any prejudicial effect that the prosecution's hypothetical may have had on the jury's understanding of the law. *Id*. Defendant does not contend that the trial court misstated the law at any point during the proceedings. Accordingly, the hypothetical did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Fyda*, 288 Mich App at 461.

Defendant next argues that the prosecution used voir dire to elicit promises from the jury that they would convict defendant regardless whether the prosecution proved malice. "The function of voir dire is to elicit sufficient information from prospective jurors to enable the trial court and counsel to determine who should be disqualified from service on the basis of an inability to render decisions impartially." *People v Sawyer*, 215 Mich App 183, 186; 545 NW2d 6 (1996). "In voir dire, . . . potential jurors are questioned in an effort to uncover any bias they may have that could prevent them from fairly deciding the case." *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994). "What constitutes acceptable and unacceptable voir dire practice does not lend itself to hard and fast rules." *Sawyer*, 215 Mich App at 186 (citation and quotation marks omitted).

Defendant mischaracterizes the prosecution's questioning during voir dire. Rather than eliciting promises about whether each juror would convict defendant, the prosecution was

questioning each juror if they were comfortable with the idea of convicting a person of murder even though the person did not technically kill another person. This was a proper line of questioning to determine whether the jurors would be able to apply the law of aiding and abetting a felony murder to the facts of this case. Because the prosecution was attempting to determine whether the jurors could impartially apply the law, this was a proper function of voir dire. *Sawyer*, 215 Mich App at 186. Further, to the extent that these questions may have confused the jurors as to the elements of aiding and abetting a felony murder, the trial court gave curative instructions, as previously discussed. Accordingly, the prosecution's questioning of potential jurors about whether they would be comfortable convicting defendant for a murder even if defendant did not technically kill another person was not plain error.

Defendant also argues that defense counsel's failure to object to the prosecution's hypothetical amounted to ineffective assistance of counsel. However, as previously discussed, defendant was not prejudiced by the prosecution's hypothetical. Therefore, defense counsel's failure to object to the prosecution's hypothetical did not amount to ineffective assistance of counsel. See *Armstrong*, 490 Mich at 290.

Defendant next argues that his Judgment of Sentence should be corrected because the trial court erroneously charged him $600 in attorney fees when defendant retained independent counsel. Before this decision, the trial court amended defendant's judgment of sentence and removed the $600 attorney fee. Therefore, this issue is moot. See *People v Billings*, 283 Mich App 538, 548; 770 NW2d 893 (2009) ("Because defendant has already received the relief that she requested, this issue is moot.").

Affirmed.


/s/ Stephen L. Borrello
/s/ David H. Sawyer
/s/ Jane E. Markey